We'll move to our second case this morning, Jacinta Downing v. Abbott Laboratories, and Ms. Friedman will be arguing remotely. And, Ms. Friedman, I see you on Zoom. Can you hear me? I can. Thank you, Judge. All right, then you may proceed whenever you're ready. Thank you, Chief Judge. May it please the Court. Good morning. My name is Linda Friedman and I represent the appellate, Jacinta Downing. I would like to thank you for the late request to appear by Zoom. I apologize that it came at such a late time, but I appreciate the opportunity to be heard. For over 50 years, this Court has issued scholarly and thoughtful opinions on the topic of how plaintiffs are to prove racial discrimination lawsuits. And the Court has thoughtfully set forth, as has the Supreme Court, the various kinds of evidence that are admissible to meet this burden. That evidence routinely includes evidence of comparable people who are similarly situated, who are treated more favorably, MeToo evidence, which may be evidence of people who are also in the protected class, but treated disfavorably, statistical evidence, evidence of stereotypes consistent with the Price Waterhouse case, and evidence of pretext that lies are being told, and particularly with the mendacity for the truth. And as this Court has repeatedly acknowledged, corporations today do not tell plaintiffs that they're being denied a job or being terminated because of their color of their skin. Here, the District Court thoroughly reviewed all of the evidence on a motion for summary judgment. It even took the unusual step of holding a hearing to allow the parties to present thorough arguments. When the District Court resolved the motion for summary judgment, the District Court cited evidence. It acknowledged that there were tribal issues of fact in each of the above categories. For example, the District Court cited specifically the favorable treatment of Mr. Kohler, who was investigated regarding his treatment of women who reported to him and was found to have significant faults in leadership, but was not put on a performance plan. The District Court acknowledged the coworker testimony that was presented through declarations. The District Court wrote, Abbott maintains that numerous employees expressed concern about Ms. Downing's management style, demeanor in front of customers, and general understanding of Abbott products. But Downing has produced evidence to the contrary. The Court then went on to cite the declarations of Mr. Cerny, as well as other subordinates who reported to Ms. Downing, and there were other evidence in the record relating to her relationships with her team, her appearance in front of customers, and all of the other arguments that had been made. The District Court also cited Me Too evidence, climate survey that was given. The climate survey came about after Ms. Downing and other employee filed complaints of gender discrimination. The four managers were then interviewed and their responses were written down. Those responses indicated that the male manager felt very comfortable and felt supported by Mr. Kamakis, but the three women all reported significant issues, and one even confirmed that Mr. Kamakis was harder on Ms. Downing, and she didn't understand why. The District Court also relied on statistics. So Plano prepared for the trial, ready to put on witnesses with respect to the triable issues of fact that had been defined by the District Court, and then days before the trial, everything changed. The District Court lost confidence in the jury's ability to hear any of this evidence and kept it out. The District Court, days before the trial, decided to bar any kind of evidence that would require an inference with respect to Ms. Downing's performance. So witnesses were not allowed to testify to refute the lie that had been told about her, and they were not allowed to offer any evidence of their actual experiences reporting to Ms. Downing, unless they also were able to testify that they had given that same information to the decision makers. So for example, the decision maker made arguments about Ms. Downing, that she lacked executive presence, that she was defensive, that she was combative, that she was not particularly smart, that she did not appear well in front of customers, even though she had been at the company for a long time and had earned favorable reviews, including an exceed on her last performance, and this was a brand new supervisor. The District Court did not allow the people who reported to Ms. Downing to say those are all lies. She's a phenomenal leader, that's why we won, and the team was ranked number one. That's why we've excelled, that's why we've performed well. And the District Court said the reason why was because the District Court felt that those persons had to have first communicated that information to Mr. Famakas. So this new rule of you must tell the manager before you can prove pretext was introduced in this case. And it is a particularly strange rule because if nobody on her team had any reason to believe that Mr. Famakas was attributing to them the statement that Ms. Downing lacked executive presence, they would have had no reason to go up to her and say, gee, we think Mr. Famakas and say Ms. Downing has tons of executive presence. So this was a new rule that's not supported by any case law and substantially interfered with the plaintiff's ability to present her case. I'm not sure, Ms. Friedman, if I could interrupt, I'm not sure it's a new rule. It's a, it's, it was a ruling that was tethered to the requirement that the plaintiff prove intentional discrimination. So if the decision maker on the challenged decisions was unaware of the evidence that you wanted to get in, it hasn't any bearing on the decision maker's opinion that led to the challenge job action. Thank you, Chief Judge. I think there's a distinction that is very important in this case. And what is in the cases that the defendant cited that deal with the issue of coworker testimony, the testimony comes in the nature of this form. The manager says, I'm terminating you because I don't believe you build very good widgets. And the employee wants to bring in a couple of people to say, I think she builds great widgets. And courts have found that that evidence of opinion by those coworkers is not particularly relevant because both things could be true.  That highlights, that example highlights the reality, and we've said this many times, that, that Title VII and other employment discrimination statutes are not workplace codes for challenging whether the decision that was made was right or wrong, but whether it was pretextual for racial discrimination. Right. And if I may. Those are two different inquiries. And the only way it can be. Absolutely. Well, that evidence can be relevant to the question of pretext as if the decision maker was aware of it. Absolutely. In this case, what the decision maker said and the basis of the testimony was that your team expressed these concerns. Your team expressed concerns about your credibility, your executive presence. Before Ms. Downing was disciplined, Ms. Longoria said, Peter still gets constant feedback from her team. That her team is not comfortable bringing her in front of higher level individuals. So the lie in this case is a little bit different. The lie is that those team members never said that. Those team members never provided that information to Mr. Kamakis because they didn't believe that information to be true. And so you have a situation. So if you said, for example, I'm not going to give a job to somebody because I think that woman spends more time raising her children than she does mentoring the people who work for her. And that lie itself is the stereotype. In this case, it was the stereotype. The stereotype was, does she or does she not have executive presence? Whatever that term means. We asserted that that term meant white men because that's who were their executives. And she is a black woman who wears her hair in braids. But what the criticism was in very, very different in this case was attributed to the very people who wanted to testify. So if the argument was, we're not going to promote a woman because her employees told us that she spends more time thinking about her children than she does about this job. Wouldn't it be important for a jury to hear from those employees that they never said that, that they didn't believe it and that they didn't feel it was true? Because once you tell that lie and you prove that lie with mendacity, what you're left with is the race. And that's where Dr. helpful to explain that these assertions that somebody is combative, aggressive, defensive, angry, that they all fall under the same category of that's the race. That's the claim. That's the stereotype. And under Price Waterhouse, the jury was entitled to know that those comments that were made up in thin air were born of race. So if Mr. Pamakis just arrived on the scene, which he did, he had never met Ms. Downing. He had never been traveled with her. He had never seen her. He was told by somebody else, his boss. She lacks executive presence, also someone who was new. If he took that theme and he went with that theme, that would one thing. If he said, that's what I was told by Mr. Pamakis, but he didn't. He said, I investigated it and the people who reported to her, they filled out a survey and then the survey disappeared. You never saw the survey. It was gone. He swore he left it on his hard drive on his computer, but it was gone. He said he met with them personally and that they told him these things. He said that they consistently reported that they were embarrassed. They could trot her out and bring her in front of the customers. That is a horrible racial stereotype. And if we had been allowed to prove that he made it all up, it was a lie with mendacity. He never heard from any of these people. They never told him that and significantly Abbott never called a single witness. Not one, not one witness, no coworkers to say they told that to Mr. Pamakis. The survey was just gone. We'd not even heard of the survey until halfway through the trial. So it's a different twist. It's not a twist of my manager says, I don't like my widgets, but I can bring in 10 people who like them very much. This was my manager says this person, this person, this person, and this person said I skipped step two, three, four, and five in the widget building and those people wanting to come in and saying, I never said that. That is just not how I feel. Not what I believe, not reality, not what happened. And if they had been allowed to cross that off and eliminate that significant, significant basis for not selecting her for the position for regional commercial director, because it appears on the spreadsheet and that significant reason for eliminating her, all that would have been left was a bunch of racial stereotypes. And that goes to the next question of Dr. Perry. The district court also didn't trust the jury to understand what stereotypes were despite Pricewaterhouse. The district court felt that the only stereotype in this case, and I'm quoting from the transcript at page 2558, he says, just because somebody describes someone as angry doesn't support an instruction that, you know, it's based on the reference to racial stereotypes. And he went on and he said, what we have here is somebody who describes someone as being angry in reaction to, you know, forget exactly the fact context and testimony was offered. But, you know, describing somebody as angry is not, in my view, remotely suggestive of using or warranting instruction that somebody is racially stereotyping. Are you angry? You know, did that make you angry? He goes on to say that that would be the case in every single employment discrimination case that we would have things that were tied to racial stereotypes and people could argue racial stereotypes. And what we would suggest is that there were many things that we could have used to prove the case. We could have used statistics. We could have, but we weren't allowed to because the judge decided, even though we cited him in a summary judgment, we couldn't offer him at court. We weren't allowed to use the METI-2 evidence on the climate surveys. We weren't allowed to use comparable evidence from similarly situated people who were treated more favorably. But this very notion that we could not contest this idea that you couldn't bring this woman in front of clients because she lacked executive presence, because she was angry, because she was confrontational, because she was dumb. That was our downfall. And that was the race discrimination. So when you're left without that truth, that those things happen, that those people actually complain, and no customers testifying, nobody witnessed any of this testifying. If you can't attack that by bringing people in to say it's a lie, then any manager in any company can just say, this is what I'm deciding based on what this person, this person, and this person told. I'd like to reserve the remainder if there are no other questions. That's fine. Thank you. Thank you. Ms. Murphy. Good morning, Your Honors, and may it please the Court, Erin Murphy on behalf of Abbott Laboratories and Abbott Molecular. Ms. Downing lost her job at Abbott Molecular as part of a company-wide reduction in force that claimed the jobs of dozens of employees, including all four of the regional sales managers, in the position that she held at the time that she lost her job. After a jury trial, a two-week jury trial, a jury of Ms. Downing's peers rejected her claims that she actually lost her job and suffered other adverse actions as the product of a pervasive conspiracy to discriminate against her on the basis of race, a claim that was particularly strange since the principal person that she accused of discriminating against her also lost his job in the very same reduction in force. Ms. Downing now claims that the jury verdict against her was actually the product of, I believe it's about 16 different errors that she's challenged in the district court's ruling, almost all of which are governed by the abuse of discretion standard. We don't believe that she's proven any abuse of discretion on any of these and in all events hasn't proven prejudice because what the record actually reflects is that the district court gave her wide latitude to introduce evidence on many of the same topics even that she's here complaining about today. If I can start, I'll talk a little bit about this issue of the subordinates. I think it's important to understand both what she did and didn't want to put in and what the district court was and was not willing to let her put in. Mr. Barmakas, the supervisor here, didn't just say kind of some unidentified subordinates or every subordinate who's ever worked for her or had problems with her. He identified specific subordinates who had raised concerns. If you look at the 13-point memo that he originally had addressed that involved concerns he had with Ms. Downing, many of which didn't have anything to do with things from her subordinates, but even as to the complaints from her subordinates, they were specific individuals. Ms. Downing didn't want to bring those individuals in and ask them, did you really say this? Is this a lie? Is he saying things that you didn't really tell them? She wanted to bring in other subordinates who didn't agree with what those subordinates had told Mr. Barmakas. And that's what the district court said. Unless you communicated that to Mr. Barmakas, I'm not going to allow that in. But you can ask any of those witnesses, you know, did Mr. Barmakas ever ask you your perspective? You can ask as many subordinates as you want if he ever asked you your perspective. So if you want to try and prove he never talked to anybody, you can do that. She, of course, didn't try to prove that because it was clear he had talked to some subordinates. He also, the district court also said, you know, if you want to bring people in to refute specific allegations, to talk about something other than, you know, something they have personal knowledge of, like there was one incident with one of the subordinates who did testify, Mr. Cerny, there had been some discussion about her trying to get him a higher pay grade. He was allowed to testify about that because he had personal knowledge and said, no, what Mr. Barmakas said isn't exactly what happened. So, you know, this is one of many instances here where there actually was quite a bit of latitude. The court just drew the line at having people come in and simply testify that, you know, I thought she was a very good boss. I thought she was great and did well in front of clients because the district court recognized consistent with the case law in this circuit that that kind of confuses the issue because the question isn't whether she was or was not a good boss. The question is, you know, were his views on what he said as his reasons for putting her on a performance plan and a coaching plan pretextual and that evidence really had very little to do with that so was minimally probative and much more likely to be confusing for the jury. You can see sort of a similar dynamic with the complaints about the climate survey. The bulk of the evidence relating to the climate survey came in. There was a climate survey done with four people. They provided hard responses to in a confidential format to the person who conducted the investigation and that was then anonymized into a PowerPoint presentation to preserve some confidentiality and anonymity before it was presented to Mr. Farmakis and other relevant individuals here. That PowerPoint was allowed to come in. That PowerPoint said repeatedly that, you know, reflected that three out of four of the people working for him had given him poor evaluations on numerous things including specific comments about he treats the male employee better than the three women. He doesn't respect the three female employees. Ms. Downing elicited testimony from key people at the company who said it was perfectly clear from the PowerPoint presentation, same one the jury was able to see, that what was going on here was the three women who were, you know, that she claims were treated less, were treated more poorly than the male employee had said that and had made that clear and Mr. Farmakis understood that. So the only thing the district court drew the line at was, I'm not going to let you bring in the actual raw confidential reports that were provided in large part because they were never given to Mr. Farmakis or anybody else relevant here because they were confidential investigatory materials. So what you have here on these evidentiary rulings, if you kind of look closely, is not at all a case where the court said you can't have circumstantial or indirect evidence or any of these things come in. The court just looked carefully at what was available and said, okay, I'm going to, you know, give a little to you, give a little to you. I mean we were objecting to a lot of this evidence coming in and lost our objections and it came in and I think the judge was just trying to draw very careful lines here about trying to allow Ms. Downing to make her case without it becoming, you know, a trial full of mini trials about which subordinates are right in their views about her or kind of let's come in and litigate complaints that were raised against different employees by different employees involving completely different factual circumstances that really have nothing to do with this case. And all of that is just classic, you know, the discretionary determinations that a district court gets to make when trying to manage a trial and keep the jury focused on the things that really are key to the legal issues that they are supposed to be resolving. I'll say a brief word about the statistical evidence. You know, Ms. Downing makes much of the fact that the district court was willing to consider that evidence at the motion for summary judgment stage but then didn't allow it in at trial. Judge Tharp acknowledged that and explained exactly why he changed his view on that and it was because we didn't make the same arguments at the motion for summary judgment. We had said you shouldn't look at this evidence because it's just not that representative when you look at the broader company and statistics at the company. When it came time for motions in limine, you know, we presented more evidence to the judge and explained that the real problem with the statistical evidence was it was just raw reporting EEOC type data with nothing to contextualize. There was no evidence about why the black employees that had left the company had left. So there was nothing to show that they had been similarly situated in the sense of being fired. For all we know, they were promoted to another division of Abbott or left for better opportunities or retired. There was nothing to tell us that in the record and the judge said I know I considered this at summary judgment. I understand that. I'm reaching a different conclusion now because I have more evidence before me and I now understand that these statistics are less reliable than I initially thought they were when I didn't have the full picture. And as he explained, you know, it's perfectly within a district court's rights to that's why we have multiple stages all the way up until trial and have things like motion in limine proceedings where you take a closer look at the full evidence and make those determinations. We're going to see what else was covered by Ms. Downing here. You know, I think on Dr. Peary, the expert that was excluded, the district court didn't exclude the expert or raise some concern that he didn't think the jury could understand the concept of stereotyping. Dr. Peary's report was excluded because Dr. Peary went out of her way to say I am not opining on whether stereotypes were at play in this case. Dr. Peary, in fact, opined that there's no way to know whether stereotypes were at issue in this case and made very clear that the sole thing she'd been offered for was to opine on kind of what stereotypes exist as to black women and whether certain evidence in the case could be consistent with stereotypes. What the judge said at that point was look, this seems to me to not be particularly relevant or reliable evidence for the jury. It's not particularly relevant because there's no opinion being offered to the jury and it's not particularly reliable because the expert is acknowledging that she has no methodology for arriving at even the basis of whether the evidence was consistent with stereotypes. So at that point, you know, the judge said I think this is just more, it's not really going to move the needle and if anything it may just confuse the jury to have an expert who's kind of trying to toe this line between, you know, I'm talking to you about the possibility of stereotypes and I'm offering you an opinion but I'm not really offering you an opinion. You know, that's again kind of classic heartland abuse of discretion for the district court. But what the court made clear in the process both then and at the jury instruction colloquy that Ms. Downing's counsel was referencing is that the judge understood perfectly well that of course stereotyping, you know, decision making on the basis of stereotyping can be a form of discrimination. The judges did not think that Dr. Peery's expert testimony would be very helpful there and didn't think that a stereotyping instruction was warranted because that wasn't really the way that the case had been presented to the jury. I understood Judge Tharp's order on the exclusion of the expert to additionally rest in part on his concern about its foundation in the concept of implicit bias. Yes. And that she's an expert in implicit bias. A lot of her literature and the literature that was in the report had to do with implicit bias and that's definitely not the standard in the Title VII. Absolutely. Explicit intentional bias and it would send the jury the wrong or leave the jury with the wrong impression about what the legal standard in the case is to admit an expert whose opinion is based on the concept of implicit bias. Yeah, that's absolutely right, Chief Judge Teggsman. And I know that, I believe it's in her reply brief, Ms. Downing has said no, no, no, she wasn't talking about implicit bias. If you go look at her expert report, which is at the beginning of Ms. Downing's appendix, it's very clear that there's kind of a mix of discussion of both implicit and explicit bias and stereotyping and that was very much a concern, that that's another line that her testimony would be towing. And Ms. Downing has not challenged the, I think it's pretty clear law at this point, that Judge Tharp reached earlier on in the case, that implicit bias would not be a basis for finding disparate treatment under Title VII here. So I think it's just one of many reasons that it made good sense to exclude the expert here. And I would note, yes, this expert has done testimony that's been admitted in other cases, but I think that there's been some lessons learned over time. One of those was a bench trial where the judge said, look, I'm in a better position than a jury to understand these distinctions. Another was where I think Dr. Peery, over time, has focused more on, I am going to figure out how to offer opinions because if your opinion is there's no way to know what happened here, that's pretty hard to get admitted as expert testimony. So I think really, at the end of the day, all of the evidentiary rulings here were just well within the heartland of the kind of discretion that the district court has. And the last point I just make, just stepping back a bit, is some of the issues that you're hearing about today, and particularly about the subordinates or comparators, I mean, that all kind of misses the bigger picture, that there was a lot going on here that Mr. Farmakas, the principal decision maker, had identified as the problems with Ms. Downing that had nothing to do with just kind of notions of her executive presence and things like that. I mean, there was objective documented things like holding a critical software key hostage as a negotiating tactic that put actual patient health at risk, writing off a $177,000 client debt without getting the necessary internal approvals first. There were other instances of her having offered contractual terms and such to clients without approvals, problems with her forecasting, problems with meeting her goals. I mean, these were not things that were, oh, somebody told me she's not a very good manager. There was, you know, if you look at that document, I think it's at page 87 of our appendix, that has this kind of 13-point list initially after he'd kind of come in and been told, see what, you know, learn this team, figure out who's got what problems, that's why we're bringing you in because we have a company that's really struggling here and we need somebody to kind of turn the ship around. Most of them don't really have anything to do with those kind of concerns being raised by her subordinates, and I think that, too, goes to show why these arguments about comparators, you know, are not really comparators. These were not people that had the same problems. It's just efforts to get in the extremely prejudicial testimony that there had been complaints, discrimination complaints raised against other people at the company that had nothing to do with Ms. Downing or any of the facts in this case. Ms. Murphy, on the disparate impact claim where we do have de novo review, you've argued that 10 is too small of a data set. At what point does that number become valid, or does the case law speak to what point that number becomes valid? Yeah, I don't think there's sort of like a hard cutoff on the numbers. I actually think there's an EEOC reg that she had relied upon below that I think is pretty helpful. It's 29 CFR 1607.4, and it sort of says, like, look, in your mine run case, there's a four-fifths rule, and that's going to typically satisfy it. But the reg then says two things that I think are important. The first is, you know, if the sample size is too small, that that's not statistically significant, then we can't rely on the rule. But then what it says is kind of the smaller the sample size, the greater latitude to bring in other instances in which the same policy has been used. So, you know, if you have a job that only 10 people applied for, but you can show that the same process had been used 20 times, you know, then you broaden your lens a little bit and look at a different type of statistics. The problem here is, you know, that she just was saying there's one job, there was one time that it was too discretionary, and there were only 10 people, and I think that really is too low. I mean, I think this court has affirmed in cases all the way up to, like, 50 people that that's still a pretty small size. But the last thing I would note, though, is, you know, she's still able to bring in all of her complaints about the process as disparate treatments and to make her arguments to the jury that she didn't think they considered her fairly in the process. It's just that it didn't support a disparate impact claim that's based solely on the fact that the two African-Americans, you know, got the lowest score. That fact was still well before the jury presented, you know, many times as part of her disparate treatment. Thank you. If there's no other questions, we would ask the court to affirm. Thank you. Ms. Friedman. Thank you. First, the assertion that the only people who were attributed to have said that Ms. Downing lacked executive presence, was unprofessional, was not smart, could not be brought in front of customers, whereas containing the 12-point memo is false. That memo came out within weeks after Mr. Kamakis came on the job in late 2012 and was written by the first week of January. Later, right before the performance improvement plan, Ms. Longoria testified, Peter still gets consistent feedback from her own team that it is not comfortable bringing her in front of higher-level customers, and he also testified repeatedly that it was the entire team who was making these comments. The second point I wanted to raise is that this judge well understood that Dr. Perry did not have an issue with implicit bias. There's a footnote in the opinion where the judge writes, Dr. Perry appears to share the view that implicit bias evidence lacks relevance in the context of disparate treatment claims. So the judge's issue with Dr. Perry had nothing to do with implicit bias. We were aware of his opinion in Jones v. YMCA, and we stayed very clear of that. Additionally, in the Supreme Court case Hopkins, the Price Waterhouse case, Dr. Fiske did the exact same thing. The Supreme Court notices that Fiske admitted that she could not say with certainty whether any particular comment was the result of stereotyping. But the evidence was allowed, and it's because experts can serve two purposes. They can opine on an ultimate question of fact in a case, but they can also serve to educate a jury. So all we wanted to do was offer her to say stereotypes exist. This is what they look like. These are the ones that are common for African-Americans. It is your job, jury, to determine whether they were present in this case. And that would have been very helpful to have her there. With respect to the notion that Ms. Downing almost caused somebody to die or that she gave away debt in Veracar, where we were able to refute with absolute evidence these concrete examples, we refuted them. They said she didn't have approval on contract. We produced an email that said approved. They said she didn't have approval to give out free training slots. We produced an email that said there was a process for doing that. Where we had trouble was with these nebulous concepts that are steeped and born in stereotype. She wasn't good in front of clients. She lacked executive presence. She was dumb. She was not professional. And that it came from her own team who was embarrassed by her. And they were not embarrassed by her. They celebrated her. We were able to bring in one of the two people that's mentioned in the 12-point memo is Stephanie Clark. We did bring in a beautiful thank you letter that Ms. Clark wrote to Ms. Downing. So it's not true we didn't refute in that one example. But that was also shared with Mr. Famakis, so therefore he knew about that example. So we were allowed to get that in the door. That was the difference. If there was an inference to be drawn, we weren't allowed to produce that evidence. It was only if we could come up with a piece of paper that was the direct evidence that caused the problems. And I would submit that in these cases you have two burdens, really three. One burden is to show that there's a lie. The second is to show that the lie is born in discrimination. And the third is to show that but for the discrimination, the person would have gotten the job. The testimony from the coworkers would have been relevant to all three. It would have shown the lie. It would have shown that the lie was made with mendacity. And it would have shown, most importantly, that she was vying for a job as a regional commercial director. It would have shown that she was qualified for that job. They asked a question, can we award punitive damages? There must have been something in the case that they didn't like. There must have been something that they felt was uncomfortable, that Abbott had done wrong to pose that question. They didn't say, do we need to hit that question? We need to address it if we answer no. They said, can we award them? And our argument would be that we don't know where they fell off the sled. They may have not had any evidence to determine if she would have otherwise gotten the job but for the discrimination. But we weren't able to induce anything favorable about her. And for those reasons and others, we believe that district court committed an abuse of discretion and we failed to follow a long line of cases in this district and in the Supreme Court that teach how you use these very pieces of evidence in order to prove discrimination. Thank you. Thank you. Our thanks to all counsel. The case is taken under advisement.